**SOUTHERN FARM BUREAU LIFE INSURANCE CO., Appellant,**

v.

**Steven M. DETTLE, et al., Appellees.**

No. 07–84–0252–CV.

Court of Appeals of Texas, Amarillo.

March 31, 1986.

Rehearing Denied April 23, 1986.

Marvin W. Jones, Gibson, Ochsner & Adkins, Amarillo, for appellant.

William E. Minkley, Metcalf & Minkley, P.C., Dumas, for appellees.

Before DODSON, COUNTISS and BOYD, JJ.

DODSON, Justice.

Southern Farm Bureau Life Insurance Company appeals from the trial court's judgment rendered in favor of Steven M. Dettle and Phillip D. Dettle, as administrators of the estate of Douglas Dee Dettle, deceased. The controversy arose from the appellant's failure to pay death benefits on a policy insuring the life of Douglas Dee Dettle. The deceased-insured was found dead in his apartment in Stratford, Texas. He died as the result of a single shotgun wound to his lower abdomen and genital area. The appellant defended on a suicide exclusion in the policy and certain alleged misrepresentations in the deceased's application for insurance. In response to special issues, the jury determined that the deceased's death was not a suicide and that the deceased's "no" answer to the question in the application, "Have you in the past 5 years used alcoholic beverages to excess or intoxication?" was not false.

In this Court, the appellant claims that: (1) the court's definition of suicide is erroneous; (2) it conclusively established its misrepresentation affirmative defense; (3) the jury's answer to the misrepresentation defense was contrary to the undisputed evidence; and (4) the jury's answer to the misrepresentation defense was against the great weight and preponderance of the evidence. Concluding that the appellant's points of error do not present cause for disturbing the judgment, we affirm.

By its first point of error, the appellant claims "the trial court's definition of the term 'suicide' erroneously included the element of intent, thereby placing upon appellant a greater burden of proof than that required under either its contractual language or Texas law." We disagree.

■ In pertinent part, the policy in question provides:

**Suicide.** If the Insured within two years from the date of issue of this policy *shall die by his own hand or act whether sane or insane,* the liability of the Company shall be limited to an amount equal to the premiums actually paid, without interest. (emphasis added)

In submitting the case to the jury, the trial court inquired:

Do you find from a preponderance of the evidence that the death of the decedent, Douglas D. Dettle, was a suicide?

In conjunction with that issue, the trial court gave the following definition:

"Suicide" means the intentional taking of one's own life, by his own hand or act, whether sane or insane.

In its objections to the court's charge, the appellant stated: "First, the instruction [*i.e.,* definition of suicide] as stated with the word "intentional" in it, misstates the definition of suicide in the insurance policy upon which suit is brought, and as such placed a greater burden on the defendant than should be required under that insurance policy." Thus, if the word "intentional" is omitted from the definition as the appellant asserts, the definition would read: " 'Suicide' means the taking of one's own life, by his own hand or act, whether sane or insane." In that regard, the appellant cites us to no Texas case where its asserted definition or a similar definition has been approved or suggested by the court, nor have we found such a case.

The appellant, in essence, contends that we should give a literal interpretation to the language of the policy (*i.e.,* "shall die at his own hand or act whether sane or insane"). In that regard, we point out that an overwhelming majority of the American courts have refused to give a literal interpretation of the policy language in question and other similar language. *See* Annot., 138 A.L.R. 827 (1942); and Annot., 35 A.L.R. 160, 162 (1925). As stated in 35 A.L.R. 162:

Although the word "suicide" *connotes an intention to kill oneself,* and the various phrases frequently employed in place thereof—"die by his own hand or act," "self-destruction," and the like—do not literally import such an intention, yet the courts frequently declare that these substituted phrases are equivalent to "suicide," and very few of the cases base any distinction upon their use in place of that word .... *Indeed, it is apparent that these phrases cannot be given their full, literal significance consistently with the intention not to relieve the insurer in case of pure accident.* (emphasis added)

In this instance, as in most cases where the defense is suicide, the primary issue is whether the death is a suicide, accident, or an accident or homicide at the hand of an unknown third party. Consequently, if the policy language is given a literal interpretation and the court charges in the policy language, the insurer can avoid liability even in those instances of pure accidents (*i.e.,* a pure accidental death at one's own hand is excluded by a literal interpretation of the policy language). Accordingly, we overrule the appellant's first stated contention under the first point of error.

In its objections to the challenged definition, the appellant further stated:

Second, the inclusion of the word "intentional" in that definition is contrary to the law that suicide does not have to be an intentional act; and,

Third, the defendant objects to that portion of the instructions submitted in connection with Special Issue No. 1 because it conflicts with the last portion of that same instruction which says quote [sic] "whether sane or insane," end quote [sic], in as much as the word intentional effectively negates that instruction and permits the jury to find that this wasn't a suicide if the defendant was insane, because he would not have the requisite intent to take his own life. Again that is contrary to the law and contrary to the wording of the policy upon which suit is brought.

Under the second and third objections to the definition, the appellant, in essence, claims that under the Texas law, suicide does not have to be an intentional act and the court erred by defining suicide as an intentional act. We disagree.

To support its position, the appellant primarily relies on *Aetna Life Insurance Company v. McLaughlin,* 380 S.W.2d 101 (Tex.1964). In *McLaughlin,* the action was brought by the insured's widow to recover under an accident insurance policy for the insured's death. The insurance policy excluded coverage by "suicide, sane or insane." 380 S.W.2d at 102. The insured's death occurred when he lunged in front of a moving school bus. The evidence shows that the deceased was an unhappy and deeply troubled man and that he had been drinking heavily and was intoxicated at the time of his death. The Court stated that, as it viewed the evidence, the evidence was sufficient to support the theory that the deceased met his death by accident. However, as the Court further stated, "[o]n the other hand, the evidence is sufficient to support the theory that McLaughlin threw himself directly in the path of an oncoming bus,—an act which, if done by a sane man, would be considered suicide." 380 S.W.2d at 104. The Court, citing the court of civil appeals decision, also pointed out that the evidence was sufficient to "raise the issue of temporary insanity produced by the drinking of intoxicants." 380 S.W.2d at 104.

In *McLaughlin,* the following issue and instruction was given to the jury:

Do you find from a preponderance of the evidence that the death of W.L. McLaughlin was not the result of suicide? .

You are instructed that by suicide is meant *intentional self destruction* and that one may commit suicide although insane or intoxicated so long as the act is the result of the exercise of his own will in any degree, *and he understands the nature and probable consequences of his act.* (emphasis added)

380 S.W.2d at 103. The insurer objected to the instruction on the ground that "it fails to advise the jury that in order for an act to be suicide it *is not necessary* that the person so committing suicide have a *rational* understanding of *the nature and probable consequences of his act ....*" (emphasis added). 380 S.W.2d at 103. Concluding that the objection was sufficient to preserve error, the Court determined that the trial court erred by including in its definition the phrase that "and he understands the nature and probable consequences of his act."

■ En route to its determination in *McLaughlin,* the Court observed that "the controlling issue is whether Texas does or should follow the majority rule as to the construction of the suicide clause of the policy as opposed to the Kentucky or minority view." 380 S.W.2d at 101–02. Expressing the majority view, the Court stated:

> *The majority view is* that for an act to be "suicide, sane or insane," *it is not necessary for the decedent to have realized the physical nature or consequences of his act, nor that he have had a conscious purpose to take his life.* (emphasis added)

380 S.W.2d at 102. Further, in expressing the minority view, the Court stated:

> The Kentucky rule is that consciousness of the physical nature and consequences of the act *and* an intention to kill oneself are essential to invoke the "suicide, sane or insane" exclusion. (emphasis added)

380 S.W.2d at 102, citing Annot., 35 A.L.R. 160, 174 (1925). Explaining the difference between majority and minority rules, the Court stated:

> The difference between the two doctrines stems from divergent concepts of the word, "suicide." *The majority view accepts* a *broad popular definition of the term as* covering any act of self destruction. *The minority view is* essentially a criminal law or technical concept in *that understanding and intent* are deemed *essential elements* of a suicide. (emphasis added) *

380 S.W.2d at 102. Thus, under the minority's definition there are two essential elements of suicide. Those essential elements are: (1) an intent to kill oneself; and (2) a conscious understanding of the nature and probable consequences of one's act. The majority's view requires only an intent to kill oneself. As we pointed out above, the intent element (or words of similar import) is essential and necessary to distinguish a suicide from a pure accident at one's own hand or act.

In this instance, the trial court simply instructed the jury that suicide "means the intentional taking of one's own life, by his own hand or act, whether sane or insane." That definition substantially complies with the majority view adopted by the Court in *McLaughlin.* In that regard, we pointed out that the trial court's definition does not include the second element from the minority view (*i.e.,* that he understood the nature and probable consequences of his act) which was condemned in *McLaughlin.* Consequently, we conclude that the trial court did not err by overruling the appellant's objections to the charge. The appellant's first point of error is overruled.

By its live trial pleadings, the appellant plead, as an affirmative defense, that the policy of insurance in question was procured and obtained by the deceased through material fraudulent misrepresentations. In particular, the appellant plead that on the application for insurance, the deceased fraudulently misrepresented that he had not in the past five years prior to issuance of the policy, used alcoholic beverages to excess or intoxication. In response to special issue number 2(a), the jury determined that the deceased's "no" answer to the question in the application "Have you in the past 5 years, used alcoholic beverages to excess or intoxication?" was not false.

---

* The broad, common, and accepted definition of suicide is simply "the act of killing oneself intentionally." Webster's New World Dictionary 1424 (Second College Edition 1980).

■ The appellant's last three points of error relate to its affirmative defense of misrepresentation. By its second point of error, the appellant claims "[t]he trial court erred in failing to render judgment for appellant with respect to its affirmative defense of misrepresentation because the uncontroverted evidence established such affirmative defense as a matter of law." In that regard, we must point out that the appellant did not present in the trial court any of the following matters: (1) objections to the court's charge concerning special issues numbered 2(a), 2(b), 2(c), 2(d), and 2(e) (*i.e.*, the issues related to the appellant's affirmative defense); (2) a motion for an instructed verdict on its affirmative defense; (3) a motion for judgment notwithstanding the jury's verdict on its affirmative defense; (4) a motion to disregard the jury's answer on the affirmative defense and render judgment for the appellant; and (5) a motion for new trial on the ground that the appellant conclusively established all of the essential elements of the misrepresentation defense.

The record fails to show that matters complained of by the appellant in its second point of error were presented to and ruled on by the trial court. In the absence of predicating action in the trial court, appellant's second point of error presents nothing further for review in this Court. *See e.g., Aero Energy, Inc. v. Circle C Drilling Co.*, 699 S.W.2d 821, 822 (Tex.1985); *Durham v. Uvalde Rock Asphalt Co.*, 599 S.W.2d 866, 876 (Tex.Civ.App.—San Antonio 1980, no writ).

Nevertheless, even if we assume arguendo, that the appellant's second point of error properly presents for review the matters stated therein, we would be required to determine that point of error by principles applicable to a motion for instructed verdict and a motion for judgment notwithstanding the jury's verdict. In that regard, if there is any evidence of probative force to raise an issue of fact on any essential element of the appellant's affirmative defense, the second point of error must be overruled. *See Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 295 (Tex.1983). Fur-

thermore, we must consider all of the evidence in the light most favorable to the appellees, discard all contrary evidence and inferences, and if reasonable minds may differ on the resolution of controlling facts, jury issues exist and the point of error must be overruled, *Id.*

■ The record shows that the application for the insurance in question was dated 9 March 1980. The application was signed by the deceased. In the application, the "no" answer was checked to the question "Have you in the past 5 years, used alcoholic beverages to excess or intoxication?". It is now settled law in this State that five elements must be plead and proved before the insurer may avoid a policy because of a misrepresentation by the insured. *Mayes v. Massachusetts Mut. Life Ins. Co.*, 608 S.W.2d 612, 616 (Tex. 1980). Those five elements are:

(1) the making of the representation;

(2) the falsity of the representation;

(3) reliance thereon by the insurer;

(4) the intent to deceive on the part of the insured in making same; and

(5) the materiality of the representation.

*Id.*

In this instance, if the appellant failed to conclusively establish one of the essential elements, the second point of error must be overruled. In that regard, the evidence shows that the deceased may have had a drinking problem for thirty years before his death, and that during the course of receiving treatment for alcoholism at Cushing, Oklahoma, he acknowledged that he had a drinking problem. However, the treatment at Cushing, Oklahoma occurred in 1981, after the insurance policy was issued in March of 1980. In the record, the deceased's "drinking problem" is not demonstrated by evidence of specific incidents of excessive use of alcoholic beverages or intoxication during the period in question (*i.e.*, 9 March 1975 to 9 March 1980).

At the trial, the appellant presented testimony from Dr. Claude Harlow, a medical

doctor. Dr. Harlow had been practicing medicine in Sherman County, Texas, since 1972. He first saw the deceased professionally in August of 1975. At that time, the doctor concluded that the deceased had an enlarged liver consistent with Laennec's cirrhosis. However, the deceased related no history of alcoholism and the doctor stated that "[I]n fact, he [the decedent] thought his illness was a medical illness." The doctor next saw the deceased in September of 1976. At that time, the deceased was complaining of stomach distress, diarrhea, and aggravated gastroenteritis. On that occasion, the doctor noted in his file that the deceased had been drinking.

The doctor saw the deceased in October of 1979, for an industrial accident injury to his eye. Later, in January of 1980, the doctor treated the deceased for an ear infection. The doctor saw the deceased again on 11 March 1981. The deceased was drinking on that occasion. After the 11 March 1981 visit, the deceased went to Cushing, Oklahoma for treatment. Dr. Harlow also testified that alcoholism is basically a disease of denial, in that the alcoholic denies to himself and others that he is an alcoholic. He further testified that the deceased did not acknowledge his drinking problem until he went to Cushing, Oklahoma for treatment. In that regard, the record is silent on specific incidents concerning the extent of the deceased's "drinking problems." The record fails to show specific incidents of excessive use of alcoholic beverages or intoxication during the period in question.

▬ In essence, the appellant claims that it conclusively established that the deceased answered the question falsely because the evidence shows that the deceased had a drinking problem, which he finally acknowledged a year after the policy was issued by the appellant. However, we are not persuaded that evidence of a drinking problem is legally sufficient to conclusively establish that the deceased had used alcoholic beverages to excess or intoxication during the period in question.

Furthermore, we are not persuaded that the appellant conclusively established the other essential elements of its affirmative defense. Dr. Harlow testified that he knew the deceased "quite well," that the deceased was a very honest and straightforward person, that he treated his friends and neighbors fairly, and that the doctor did not think the deceased would lie to or cheat somebody in the business field.

Consequently, when we assume arguendo that the appellant's second point of error is properly before us and when we view all of the evidence in the light most favorable to the appellees, we must conclude that there is probative evidence to raise issues of fact on the essential elements of the appellant's misrepresentation defense. Accordingly, it follows that we must further conclude that the appellant failed to conclusively establish all of those essential elements. For all of the stated reasons, the appellant's second point of error is overruled.

By its third and fourth points of error, the appellant respectively claims the trial court erred by overruling its motion for new trial because the jury's answer to special issue number 2(a) was contrary to the undisputed evidence, and was so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. In that regard, we must point out that under the posture of the record before us, the appellant's third and fourth points of error do not present cause for disturbing the judgment.

The record shows that the trial court submitted appellant's misrepresentation defense by five issues numbered 2(a), 2(b), 2(c), 2(d), and 2(e). By those issues, the trial court inquired of the jury whether: (1) the deceased's answer to the question concerning his use of alcoholic beverages in the past five years was false; (2) the deceased, in making such answer *knew* the same to be false; (3) the deceased's answer was material to the risk insured; (4) the appellant relied on the answer in issuing the policy; and (5) the deceased made the false answer willfully and with the inten-

tion of inducing the appellant to issue the policy. Issues 2(b), 2(c), 2(d), and 2(e) were each conditioned on the jury's affirmative answer to the preceding issue.

The appellant made no objection to the trial court's conditional submission of four elements of its misrepresentation defense. By not answering the last four issues, the jury literally followed the court's instruction not to answer in the event of a negative answer to special issue number 2(a).

By failing to object to the conditional submission of four elements of its misrepresentation defense, the appellant waived its right to have the jury answer those issues. *See* Tex.R.Civ.P. 279; *Bay Petroleum Corporation v. Crumpler*, 372 S.W.2d 318, 320 (Tex.1963); *Strauss v. La-Mark*, 366 S.W.2d 555 (Tex.1963); *Little Rock Furniture Mfg. Co. v. Dunn*, 148 Tex. 197, 222 S.W.2d 985, 990 (1949); *Bankers Standard Life Ins. Co. v. Atwood*, 205 S.W.2d 74, 77 (Tex.Civ.App.—Austin 1947, no writ). Under Rule 279, *Crumpler, Strauss, Dunn,* and *Atwood,* the unanswered issues must be deemed as found by the trial court in such a manner as to support the judgment.

The deemed findings in support of the judgment are not challenged in this Court. The court's deemed findings on any one of the unanswered issues are sufficient to preclude the appellant's misrepresentation defense. Thus, even if we assume arguendo, that the trial court erred, as the appellant claims by its third and fourth points of error, those alleged errors would not present cause for disturbing the judgment. Consequently, the appellant's third and fourth points of error are overruled.

In summary, the appellant's four points of error are overruled. In that regard, we acknowledge that in their brief, the appellees advance a conditional cross-point; however, our disposition of the appellant's four points of error render unnecessary a determination of that cross-point.

The judgment of the trial court is affirmed.