Mattie Emmaline **MAYES**, Petitioner,

v.

**MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Respondent.**

No. B–9153.

Supreme Court of Texas.

Oct. 29, 1980.

Taylor, Mizell, Price, Corrigan & Smith, Bradford D. Corrigan, Jr., Dallas, for petitioner.

Thompson & Knight, Eugene W. Brees and Jerry P. Jones, Dallas, for respondent.

BARROW, Justice.

Massachusetts Mutual Life Insurance Company brought this suit to rescind three policies of insurance on the life of Albert W. Mayes, deceased, because Mayes did not disclose to the insurer that certain answers in his applications which were correct when made had become false by the time the policies were delivered. Petitioner, who was the named beneficiary in the policies, counterclaimed for the proceeds of the policies together with penalty, interest and attorney's fees. The trial court rendered judgment for petitioner on the jury verdict. The court of civil appeals reversed the judgment of the trial court and remanded the cause with instructions to limit recovery to return of the premiums. 592 S.W.2d 393. We reverse the judgment of the court of civil appeals and remand the cause to that court for consideration of respondent's factual insufficiency point over which we have no jurisdiction.

On May 6, 1976, Albert Mayes signed and delivered to an agent of insurer Part 1 of two applications for life insurance.[1] These applications had been filled out by the agent and his secretary from information secured from a previous policy issued to Mayes through this agent. The applications are identical except for the amount of insurance requested by each application. On page three of each application is the following paragraph:

---

1. On May 2, 1977, the insured exercised his option to convert a part of the $100,000 term insurance policy to a Planned Protection Policy. This is the third policy in dispute.

---

**SIGNATURE SECTION — MUST BE COMPLETED IN ALL CASES**

To the best of my (our) knowledge·and belief, all answers and statements contained herein are full, complete and true and were correctly recorded before this application was signed; and it is agreed that: (a) if the first premium on the insurance herein applied for has been paid to the Company's agent in exchange for the Company's Conditional Receipt signed by said agent, the Company shall be liable only under and pursuant to the terms and conditions set forth in said receipt; (b) if the first premium on the insurance herein applied for has not been paid, the Company shall incur no liability under this application unless and until the application has been completed and approved and the policy has been issued and delivered to the owner designated therein and the first premium specified in the policy has been paid during the lifetime of each person proposed for insurance and then only if at the time of said delivery and payment all answers and statements contained in Parts 1 and 2 of this application and any amendments thereof and supplements thereto are then full, complete and true to the best of my (our) knowledge and belief as though given at the time of said delivery and payment; (c) no agent of the Company has authority to make, alter or modify the terms of this application or of any policy issued hereon or to waive any of the Company's rights or requirements or to extend the time for the payment of premiums, and (d) acceptance of any policy issued on this application will constitute ratification of any correction or amendment of the application made by the Company as shown in the Amendment of Application attached to the policy, provided, however, that any such correction or amendment of application relating to amount, classification, plan or additional benefits shall be agreed to in writing.

If this application is also signed by a purchaser, such purchaser ratifies the representations, declarations, statements, answers and agreements contained in Parts 1 and 2 of this application and any amendments of and supplements to this application, and agrees to be bound thereby.

---

Both applications required a physical examination of this forty–year–old prospect and the information relative to this examination is contained in Part 2 of the applications. Although Part 2 was filled out by Dr. Rattan, the insurer's medical examiner, it contains a number of answers to medical history questions propounded to the insured by the doctor on May 27, 1976 when the physical examination was had. Question 4 inquired as to whether the insured within the past five years: (A) had been treated by a physician; (B) had been treated or observed in a hospital; or (C) had undergone an electrocardiogram. Only question 4A was answered in the affirmative and the explanation given related only to a 1974 physical examination which Mayes had undergone in connection with a prior policy issued by Massachusetts Mutual. Questions 5A and 6A inquired if he had been treated for or had any known indication of any disorder of the heart or if he had experienced any pain, pressure or discomfort ir the chest. Both of these questions were answered in the negative.

Part 2 of the applications were referred to the home office of insurer and, because the first examination showed an elevated blood pressure, the medical examiner was directed to make a recheck of the blood pressure. This reexamination was made by Dr. Rattan on July 14, 1976. At this time, the medical examiner determined, at the request of the insurer, that the proposed insured had not had any recent medical or dietary treatment for hypertension. The policies were issued to Mayes at a higher premium because of the elevated blood pressure. The policies were delivered to Mayes by the agent on August 17, 1976 after Mayes agreed to the higher premium.

On June 29, 1976, Mayes attempted to drink cold water while having a cup of coffee. He was unable to swallow the water and felt a pain in his chest. Mayes' next door neighbor, who was a general practitioner, was called; pursuant to this

doctor's advice, Mayes went to the hospital so that Dr. Schilling, a specialist in internal medicine, might examine him. Mayes was kept in the hospital overnight by Dr. Schilling while a number of tests were made. Dr. Schilling was unable to arrive at a definite diagnosis, but concluded that the chest pain was probably the result of esophagitis, which is an inflammation of the esophagus. Dr. Schilling advised Mayes that he did not think Mayes had heart disease, but that he could not exclude that possibility. Mrs. Mayes testified she understood that the problem in Mayes' chest related to the esophagus.

Dr. Schilling next saw Mayes on July 28, 1976 at the doctor's office. Mayes complained of two more episodes of chest pain under circumstances similar to the initial episode. He was given a stress electrocardiogram to see if heart disease was involved. Again the doctor was unable to pin down the cause of the chest pain. Dr. Schilling advised Mayes of his high blood pressure and told him certain things to do to correct it. Mayes was advised that he was overweight and smoked too much. The doctor did not diagnose heart disease, but said again that he could not rule it out. He did not see Mayes again professionally. Mayes died suddenly on July 25, 1977 from a heart attack of some undetermined variety.

The verdict was substantially as follows:

No. 1. That the condition of Mayes' health changed between May 27, 1976 and the date the policies of insurance were delivered to him, August 17, 1976, to the extent that his answers to Questions 4A, 4B, 4C, 5A, and 6A became untrue.

No 2. That on the date the policies were delivered to him, Mayes knew that the condition of his health had changed to the extent that the answers to these questions had become untrue.

No. 3. That Mayes failed to disclose to Massachusetts Mutual that the condition of his health had changed after he applied for the policies to the extent that his answers to these questions had become untrue.

No. 4. That the failure of Mayes to disclose that the condition of his health had changed to the extent that the answers to these five questions became untrue WAS NOT for the purpose of inducing Massachusetts Mutual to issue the policies in question.

No. 5. That the answers as actually given by Mayes to these five questions were material.

No. 6. That Massachusetts Mutual relied on the answers actually given by Mayes to these questions when issuing the policies.

No. 7. A reasonable fee for services rendered by Mrs. Mayes' attorney in this case is $7,500.00.

The trial court overruled insurer's motion for judgment on the verdict or, in the alternative, judgment *non obstante veredicto* and rendered judgment on the verdict for the beneficiary, Mrs. Mayes. In doing so, the trial court apparently considered the insured's answers to the questions in Part 2 of the applications as representations. The trial court followed those authorities which hold that an insurer cannot avoid liability on the ground of misrepresentation by the insured unless there is a finding that the insured intended to procure issuance of the policy by representations known to be false. *See Washington v. Reliable Life Ins. Co.,* 581 S.W.2d 153 (Tex.1979); *Allen v. American National Insurance Company,* 380 S.W.2d 604 (Tex.1964); *Clark v. National Life & Accident Ins. Co.,* 145 Tex. 575, 200 S.W.2d 820 (1947).

The court of civil appeals disagreed and held that the Signature Section quoted above was in the nature of a condition precedent and that the insurer's liability depended on whether the insured knew and believed that the statements in his applications were still true at the time of delivery of the policy. Since they were not true in certain material respects, the court of civil appeals followed those authorities which have given controlling effect to contractual provisions that a policy shall not become effective unless delivered when the insured is in good health. *See Lincoln Income Life*

*Insurance Company v. Mayberry*, 162 Tex. 492, 347 S.W.2d 598 (1961); *Texas Prudential Insurance Company v. Dillard*, 158 Tex. 15, 307 S.W.2d 242 (1957); *Great Nat. Life Ins. Co. v. Hulme*, 134 Tex. 539, 136 S.W.2d 602 (1940).

█ It must be recognized at the outset that the policies in question do not contain a "good health" contractual provision. Therefore, the basic question before us is whether the requirement in the Signature Section of Part 1 of the applications that the answers in the application be true and correct at the time of delivery of the policy should be considered as a condition precedent or as a representation. We believe that this requirement is in the nature of a representation and should be controlled by the law applicable to a misrepresentation.

█ It is now settled law that if the answers to the questions in the application were untrue at the time they were given, the untrue answers constituted misrepresentations. There is no logical reason to give the failure to correct these same answers at a later time any greater significance than we give to answers which were originally untrue. In fact, there would be a greater chance that an insured was acting in good faith when he failed to report a change of condition than he would be in his originally making an untrue answer. Furthermore, the insurer knows the length of delay between the completion of the application and the issuance of the policy. If this period was significant, the insurer could easily ensure that the answers were still correct at the time of issuance of the policy either by putting a good health provision in the application or by requiring a supplemental statement of health. Here the insurer's medical doctor made a limited second physical examination of insured shortly before the policies were delivered. It is hard to understand why inquiry was not routinely made by the doctor at that time regarding the insured's recent health. The agent personally delivered the policies to the insured and persuaded the insured to accept the policies with the increased premium. It is not contended that the insured made a false statement to the doctor or the agent.

█ Under these circumstances we hold that insured's failure to advise the insurer of the changes in his prior answers were misrepresentations. It is now settled law in this state that these five elements must be pled and proved before the insurer may avoid a policy because of the misrepresentation of the insured: (1) the making of the representation; (2) the falsity of the representation; (3) reliance thereon by the insurer; (4) the intent to deceive on the part of the insured in making same; and (5) the materiality of the representation. *Washington v. Reliable Life Ins. Co., supra; Allen v. American National Insurance Company, supra; Clark v. National Life & Accident Ins. Co., supra; First Continental Life & Accident Co. v. Bolton*, 524 S.W.2d 727 (Tex.Civ.App.–Houston [14th Dist.] 1975, writ ref'd n. r. e.); *Prudential Insurance Company of America v. Torres*, 449 S.W.2d 335 (Tex.Civ.App.–San Antonio 1969, writ ref'd n. r. e.); Wiswell, *Insurance–Fraud Necessary to Avoid Life Insurance Policy*, 11 Baylor L.Rev. 236, 239 (1959). Here, although the jury found that these misrepresentations were material to the risk and were relied on by the insurer, the insurer failed to establish the legal defense of misrepresentation because it failed to secure a jury finding of intentional deception.

Insurer urges by a cross–point that the insured violated his duty to disclose material changes in his health that had occurred subsequent to the date of his applications but prior to delivery of the policies and, therefore, that the policies never came into existence. In support of this proposition, it relies largely on the case of *Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 48 S.Ct. 512, 72 L.Ed. 895 (1927), wherein it was said:

"Insurance policies are traditionally contracts uberrimae fidei and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option. . . .

"Concededly, the modern practice of requiring the applicant for life insurance to answer questions prepared by the insurer has relaxed this rule to some extent, since information not asked for is presumably deemed immaterial. . . .

"But the reason for the rule still obtains, and with added force, as to changes materially affecting the risk which come to the knowledge of the insured after the application and before delivery of the policy. For even the most unsophisticated person must know that in answering the questionnaire and submitting it to the insurer he is furnishing the data on the basis of which the company will decide whether, by issuing a policy, it wishes to insure him. If, while the company deliberates, he discovers facts which make portions of his application no longer true, the most elementary spirit of fair dealing would seem to require him to make a full disclosure. If he fails to do so the company may, despite its acceptance of the application, decline to issue a policy, . . . or if a policy has been issued, it has a valid defense to a suit upon it. . . . " (Citations omitted.)

Under the controlling Texas authorities cited earlier, the *Stipcich* rule has no application to a *misrepresentation* by the insured in the application for a policy. Since the failure of the insured here to correct his answers resulted in a misrepresentation, the *Stipcich* holding does not control this case under Texas law.

Insurer also urges by a cross–point that the evidence established as a matter of law that the insured's failure to disclose that certain answers in his application had become untrue was for the purpose of inducing the insured to issue the policies in question. Insured does not question that it had the burden of proof on this issue. *See Washington v. Reliable Life Ins. Co., supra.* We therefore must determine this question based on a "no evidence" review of the record.[2]

We recognize the rule that when, as here, an application for insurance is attached to and made a part of the policy and is accepted and retained by the insured, the insured is conclusively presumed to have knowledge of its contents and to have ratified any false statements therein. *Odom v. Insurance Company of State of Penn.,* 455 S.W.2d 195 (Tex.1970). Nevertheless, the circumstances present in this case are of some significance on the question of fraud. The Signature Section is contained only in Part 1 of the application. Mayes signed that part of the applications on May 6. They remained in the possession of the insurer until the policies were delivered on August 17. The answers around which the lawsuit revolves are contained in Part 2 of the applications which related to the physical examination given Mayes on May 27. It is understandable that Mayes would be unaware of the requirement in the Signature Section to correct his answers, at least until after he received the policies.

Mayes had reason to believe that the chest pains were insignificant. The doctor who examined him after those episodes so advised him. In fact, Mayes did not find it necessary to even consult with a doctor during the year before his fatal heart attack. There is no evidence that he had any physical difficulty of any type during that year. In May of 1977 he converted a substantial part of the term policy in question into permanent insurance. We cannot say from this record that fraudulent intent was established as a matter of law.

Insurer also urged in the court of civil appeals that the evidence is factually insufficient to support the jury finding that Mayes' failure to disclose changes in his health was not for the purpose of inducing insurer to issue the policies. Inasmuch as this factual insufficiency point is within the exclusive jurisdiction of the court of civil appeals, we remand the cause to that court for determination of that point. *Custom Leasing, Inc. v. Texas Bank & Tr. Co. of Dallas,* 491 S.W.2d 869 (Tex.1973).

---

2. *See Garza v. Alviar,* 395 S.W.2d 821 (Tex. 1965).

The judgment of the court of civil appeals is reversed and the cause is remanded to that court for further proceedings not inconsistent with this opinion.

GARWOOD, J., concurs in the result.