FREDONIA STATE BANK, Executor
of the Estate of Claytor Blake,
III, et al., Appellants,

v.

GENERAL AMERICAN LIFE
INSURANCE COMPANY,
Appellee.

No. 12–90–00293–CV.

Court of Appeals of Texas,
Tyler.

July 27, 1992.

Rehearing Denied Nov. 13, 1992.

See 881 So.2d 279.

L. Giles Rusk, Nacogdoches, for appellants.

Steve Roper, Lufkin, for appellee.

T.C. CHADICK, Justice (Retired).[1]

This is an action to collect the face amount of two life insurance policies, each in the amount of $250,000.00, and recover associated relief.

Fredonia State Bank, executor of the estate of Claytor Blake III, deceased, Fredonia State Bank, Commercial National Bank, and Claytor Blake, Inc., hereinafter collectively called the Blake Group, as plaintiffs, sued General American Life Insurance Company, as defendant, in a district court of Nacogdoches County. Trial was by jury, and judgment was entered awarding the Blake Group $690,356.14, together with postjudgment interest, costs, etc. The judgment is not wholly satisfactory to any party. The Blake Group appeals and General American urges cross-points of error.

The trial judge submitted fourteen questions for jury determination. Judgment is based upon jury answers to Questions No. 1–4. The jury did not answer Question No. 5. Answers to Questions 6–14 were disregarded on motion for judgment *non obstante veredicto* by General American.

By its response to Question No. 1, the jury found the death of Claytor Blake, III was not

1. The panel before whom this cause was submitted consisted of T.C. Chadick, Associate Justice (Retired) the Supreme Court of Texas. Honorable Gerald T. Bissett, retired justice, Court of Appeals, Thirteenth District of Texas at Corpus Christi. Honorable Jackson B. Smith, Jr., retired justice, Court of Appeals, First District of Texas at Houston, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to Tex.Gov't Code Ann. § 74.003(b) (Vernon 1988).

the result of suicide. The answer to Question No. 2, found that the medical portion, Part II, of the application, or a copy thereof, was not attached to Policy No. 1987228 upon delivery to Blake. A like answer was made to Question No. 3 respecting Policy No. 1987228. By answer to Question No. 4, the jury found that Claytor Blake, III did not misrepresent his medical history in order to obtain life insurance.

By cross-points, General American put in issue the jury's answers to the first four questions the charge propounded on grounds now to be discussed.

■ Cross-points ten and eleven raise the issue of no evidence and insufficient evidence to support the jury's answer to Question No. 1 in the charge. The suicide issue was hotly contested, and numerous witnesses testified. In testing legal insufficiency points, the reviewing court must consider only the evidence and reasonable inferences supporting the findings, disregarding all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). If there is some probative evidence supporting the jury's finding, the legal insufficiency point must be overruled. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

■ Factual insufficiency points require consideration of all pertinent evidence to determine whether the proof amounts to more than a scintilla of evidence; if so, the evidence is sufficient. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d at 661.

All parties agree that a jury finding that the death of Claytor Blake, III was not the result of suicide rendered inoperative the exclusionary provisions for suicide as pleaded by General American. General American sought an instructed verdict on the issue and objected to its submission to the jury.

■ The official death certificate showed the cause of death as undetermined. Such document is prima facie proof of the factual information it contains. *Buchanan v. American National Ins. Co.*, 446 S.W.2d 384, 387 (Tex.Civ.App.—El Paso 1969, writ ref'd n.r.e.).

Mr. Blake and his wife, Doris, arrived at the Cotton Eyed Joe Club at about 11:00 p.m. on the evening before Mr. Blake's death from gunshot wounds which he received the following morning. The club manager testified he saw Mrs. Blake slap her husband as they entered the club. The manager interceded, Mrs. Blake went back outside, and Mr. Blake went to the bar, after stating by way of apology, "I thought it was settled in the car." In a short time, the manager saw Mrs. Blake reentering, and left his office and walked with her to the bar. When she reached her husband, his back was to her; she shoved him, causing his drink to spill. Again, the manager interceded. Mrs. Blake leaned over on her husband's shoulder. The manager thought Mrs. Blake was whispering to her husband, and heard Mr. Blake say, "Woman, did you bite me?", and firmly grasped her right shoulder, but Mr. Blake did not push, slap, hit, strike, or otherwise make physical contact with his wife. The couple left the club, but the manager noticed them sitting in their automobile outside when he was closing the club at midnight. The gunshot episode occurred within a couple of hours after midnight.

The gun said to be involved was submitted by police to laboratory examination. The laboratory reported inability to find fingerprints on it. Hand swabs from the person of Mr. Blake were also subjected to laboratory examination. The laboratory was unable to detect gunshot residue (antimony, barium, and lead) on the hand swabs submitted. The report stated:

The absence of gunshot residues on hand swabs is consistent with any of the following conditions.

. . . . .

(C) Gunshot residues were deposited, but were removed or reduced due to moisture or wiping of the hands.

(D) The weapon used does not deposit gunshot residues in sufficient quantity for detection on the hands of the persons firing the weapon.

Other laboratory tests showed that the gun tested emitted gunshot residue. Mortuary personnel reported that Mr. Blake's hands were placed in plastic bags and not cleaned before the hand swabbing test procedure occurred. An autopsy report of an external examination of Mr. Blake's body, aside from a bullet wound to the head, located superficial abrasions of the right chest, suggestive of bite marks.

Mrs. Doris Blake was not tested by police to determine whether her hands showed gunshot residue. She refused to undergo a polygraph examination. Expert opinions were given that the fatal wound was consistent with a struggle over a gun or a scuffle in which Mr. Blake was holding a gun. A licensed investigator and forty-years veteran of the Nacogdoches police department testified as to his investigation, and stated his opinion was that the police homicide investigator's investigation was slanted in favor of Mrs. Doris Blake.

■ When the no evidence standard is applied, the foregoing is sufficient to show there is evidence from which reasonable inferences may be drawn to support the jury's conclusion and finding that Mr. Blake did not commit suicide. General American's no evidence contention is not well taken, and its Cross–Point No. 10 is overruled.

■ Consideration of General American's factual insufficient evidence point requires consideration of all evidence bearing upon the answer to Question No. 1. Scattered through the ten-volume, over 2,000 page, statement of facts is evidence pertinent to the issue. Relevant evidence, other than that already recited, tends to contradict, explain away, or cast doubt upon the verity of evidence supporting the jury's answer. This is illustrated by four disclaimers accompanying the Department of Public Safety's laboratory report on gunshot residue. The two that appear pertinent were recited earlier. There is eyewitness evidence from decedent's wife, Mrs. Doris Blake, that she observed Mr. Blake shoot himself. Also, there is evidence that Mr. Blake was faced with and was undergoing financial difficulties in the operation of his business, as well as alcoholic addiction and health problems. From all of

this, inferences may be drawn that Mr. Blake had mentally stressful problems with the potential of inducing suicide and did cause him to commit suicide.

■ The probative effect of the contradictory and explanatory nature of the evidence depends upon its credibility. The right to determine credibility lies exclusively with the jury. Under the standards guiding a reviewing court in insufficient evidence review, where all evidence is considered, it cannot be said that the evidence pointed out as supporting the answer to Question No. 1 is factually insufficient. Resolving the conflict shown is a jury function. General American's Cross–Point No. 11 is overruled.

Under Cross–Points No. 12, 13, 14, and 15, General American contends the jury's answers to Questions No. 2 and 3 are immaterial and contrary to the great weight and preponderance of the evidence. The Blake Group's reply brief asserts the jury's answer to Question No. 4 renders answers to Questions 2 and 3 of no effect and moot. Since the Blake Group's brief does not join issue on the four points of error, they are sustained.

Under Cross–Point 16, General American argues that the record establishes as a matter of law that Mr. Blake misrepresented his medical history in order to obtain the insurance contracts in suit.

The record contains Mr. Blake's application for insurance dated April 16, 1985, slightly less than seven months before his death on November 7, 1985. Mr. Blake answered "No" to the following questions in his application:

(6) Other than above, have you within the past five years:

. . . . .

(b) Had a checkup, consultation, illness, injury or surgery?

(c) Been a patient in a hospital, clinic, sanitorium or other medical facility?

(d) Had electrocardiogram, x-ray, other diagnostic tests?

(e) Been advised to have any diagnostic tests, hospitalization or surgery which was not completed?

. . . .

(12) Have you ever been treated for alcoholism or any drug habit?

The jury answered "No" to Question No. 4 in the charge, which asked,

Did Claytor Blake, III misrepresent his medical history in order to obtain life insurance?

In order to find that Claytor Blake, III misrepresented his medical history, you must find each of the following:

(1) Claytor Blake, III made a representation;

(2) that the representation was false;

(3) General American relied upon the representation;

(4) that Claytor Blake, III intended to deceive General American in making the representation; and,

(5) that the representation was material.

The submission is authorized by *Mayes v. Massachusetts Mutual Life Ins. Co.,* 608 S.W.2d 612 (Tex.1980). First consideration will be given to Cross–Point No. 16. The record will be analyzed to determine whether it shows as a matter of law that any of the five elements was not proven. The argument under the point narrows the issue to the fourth element of the question, that is, that Claytor Blake, III intended to deceive General American in making the representation. Mr. Blake's intent is the issue.

Mr. Blake signed a request for admission to Humana Hospital Brentwood in Shreveport, Louisiana, on January 18, 1984, approximately two months before he made application for the insurance in suit. The application contained an agreement to give seventy-two hours' notice of a request for discharge. A psychologist familiar with psychiatric hospitals said the structures are built with a lock system designed to prevent a patient from making an unauthorized departure. Mr. Blake was intoxicated when he arrived and was admitted to the hospital.

His then wife, Sandra Blake, from whom he was divorced in May 1984, provided the admittance personnel with Mr. Blake's social history. The history record recites, "According to the patient's wife, the patient is being admitted to the hospital for treatment of alcoholism. . . . She made the decision to admit the patient to Brentwood upon the recommendation of Dr. Klien." An attending nurse's report says, "Wife gave information as she was more reliable than [patient]." A nurse's report dated January 20, 1984, said, "He insists he is ready to leave the hospital, 'I never been shut up this long in my life.'" Mr. Blake called his wife to pick him up, as he was not going to stay.

Sandra Blake testified that her husband received no treatment at the hospital and quoted his statement that he did not. She said he disagreed with her that he drank too much and never admitted he was an alcoholic. The social history furnished the hospital recounted that Mr. Blake had blacked out during drinking episodes. When Mr. Blake was discharged from the hospital on January 23, 1984, he was advised to take outpatient treatments for alcoholism, but he did not commit himself to do so.

From the indicated evidence and other consistent therewith, reasonable inferences may be drawn that in his mind Mr. Blake did not consider the hospital interlude as hospitalization in any usual sense or his stay as treatment or the attention received as any form of checkup or other test or diagnostic procedure. It may be inferred that when he made the insurance application, he wholly discounted the hospital interlude as treatment, believing himself to be an involuntary prisoner at the hospital, and that any show of cooperation with attendants was an effort to effect release. Inferences also might be drawn that his mind blacked out on much of the hospital episode and he had no memory of it.

This evidence raises an issue of fact regarding intent to deceive General American. No memory of the occurrence or a genuine belief that the interlude was not hospitalization would negate a conscious intent to deceive. The jury answered the intent element of Question No. 4 favorable to the Blake Group. Cross–Point 16 must be overruled.

However, Cross–Point 17 puts in issue the great weight and preponderance of the evidence supporting element five of Question No. 4.

A review to determine whether a finding is contrary to the overwhelming weight and preponderance of the evidence requires consideration of all the evidence in the record pertinent to the finding to determine whether the finding is clearly wrong and manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660.

In 1980, Claytor Blake, III and his first wife, Sandra, owned and operated Blake Field Services, a construction business, and M & M Yamaha, a motorcycle dealership. The combined sales of both businesses in 1980 were approximately $540,000.00. In 1985, the combined sales reached $1,200,-000.00. The motorcycle agency accounted for a very small part of the totals. Mr. Blake personally operated the construction business, and Mrs. Blake was in charge of the motorcycle agency.

The operator of the type business Mr. Blake was engaged in is commonly called a "contractor." Operation includes bidding upon construction jobs and satisfactory performance in compliance with the obligations of a contract and specifications governing a job. Mr. Blake was familiar with the details of contracting and the importance of compliance. His background is that of a seasoned operator with several years of success and expanding business.

In 1984 and 1985, an economic slow-down in the company's business area was hampering cashflow. Domestic difficulties resulted in divorce from Sandra in May 1984. Mr. Blake took on an extra financial burden in settling the marital estate. The necessity for additional bank credit to sustain business operations became acute. Mr. Blake undertook to restructure his borrowing position and to afford lenders additional security. He dropped a $300,000.00 life insurance policy that was not subject to a suicide exclusionary provision and secured the two policies in suit.

Claytor Blake, Inc. was the owner and beneficiary of the two life insurance policies. Mr. Blake assigned one policy to Fredonia State Bank and the other to Commercial National Blank to secure outstanding loans he had with each of them.

The evidentiary inferences that Mr. Blake did not know or remember any or all of the Humana Hospital Brentwood interlude or that he believed his stay there did not amount to hospitalization is unaided by expert opinion. The jury's conclusion that Mr. Blake did not intend to deceive by his answer to the questions in the application totally disregards Dr. Klein's medical record detailing the treatment for high blood pressure, etc., that he had rendered Mr. Blake in the five years preceding Mr. Blake's death. Nothing in the record casts doubt upon the verity of Dr. Klein's records.

On consideration of all evidence, the record shows that Mr. Blake had a serious and compelling financial and business driven needs to secure life insurance and that he gave false answers to certain questions in his application for the policies in suit. The jury finding that Mr. Blake did not intend to deceive by his false answers apparently is founded upon inferences drawn from evidentiary facts earlier stated in regard to hospitalization. These inferences will be analyzed.

There was evidence that Mr. Blake had been drinking to excess before the hospital interlude; that he had blacked out on occasion following a drinking bout. Black out is understood to mean that he retained no memory of occurrences during the period of inebriation. There is no evidence that these blackouts occurred with every drinking episode. He was intoxicated when admitted to the hospital, but it does not necessarily follow that his memory blacked out as to events there. An inference drawn from such intoxication that he blacked out in whole or in part on that occasion constitutes very weak proof of any fact. An inference that he was held against his will derived from the facts in evidence is likewise very weak. Proof that psychiatric hospitals in general have a restraint system is not proof that this particular hospital restrained Mr. Blake against his will, as the evidence is undisputed that he was permitted to leave when he chose to. The inferences discussed illustrate the weakness of all inferences drawn from the hospital interlude.

When compared and contrasted, the conflicting bodies of evidence, one relative to

deception and the other to no intent to deceive, it is made plain that the inferences relied upon to show no intent to deceive have little cogency or probative effect, hardly more than a scintilla. On balance, it is clear that the jury's finding is so contrary to the overwhelming weight and preponderance of the evidence as to be unjust. General American's Cross–Point No. 17 is sustained.

The Blake Group's points of error 1–14 have been examined and are found to be without merit. This very lengthy opinion will not be extended to discuss them in detail. The points are respectively overruled.

A document labeled "Final Judgment" was signed by the trial judge and entered in the trial court on May 14, 1990. A document labeled "Reformed Final Judgment" was signed August 27, 1990, and entered August 28, 1990. In the body of the August judgment, the May judgment does not appear to be alluded to directly or by implication. Counsel for the parties are invited to consider whether the one final judgment provision of Tex.R.Civ.P. 301 is involved. Should a party care to comment, a motion for rehearing will be a convenient medium.

Having concluded that General American's Cross–Point 17 must be sustained, it follows that the judgment of the trial court will be reversed and the case remanded for new trial. It is so ordered.

## OPINION ON REHEARING

### T.C. CHADICK, Justice (Retired).*

The motion for rehearing filed herein and reply thereto afford an opportunity not only to reconsider the merit or clarify disposition of questions discussed in the original opinion, but also to make other appropriate changes.

This action was filed to collect the face amount of two life insurance policies, each in the amount of $250,000.00, and recover ancillary relief. Fredonia State Bank, executor of the estate of Claytor Blake, III deceased,

Fredonia State Bank, Commercial National Bank, and Claytor Blake, Inc., herein collectively called the Blake Group, as plaintiffs, sued General American Life Insurance Company, as defendant, in a district court of Nacogdoches County.

Trial was by jury, and judgment was entered awarding the Blake Group $690,356.14, together with postjudgment interest, costs, etc. The judgment is not wholly satisfactory to any party. The Blake Group appeals and General American urges cross-points of error.

By its response to Question No. 1, the jury found the death of Claytor Blake, III was not the result of suicide. The answer to Question No. 2 found that the medical portion, Part II, of the application of Claytor Blake, III or a copy thereof, was not attached to Policy No. 1987228 upon delivery to Mr. Blake. A like answer to a similar question respecting Policy No. 1987228 was made to Question No. 3. By answer to Question No. 4, the jury found that Claytor Blake, III did not misrepresent his medical history in order to obtain life insurance.

The trial judge submitted fourteen questions for jury determination. Judgment is based upon jury answers to Questions No. 1 through 4 and will be the object of initial attention and consideration. The jury did not answer Question No. 5. Answers to Questions 6 through 14 were disregarded on the motion for judgment *non obstante veredicto* by General American.

## THE GENERAL AMERICAN APPEAL

All parties agree that a jury finding that the death of Claytor Blake, III was not the result of suicide nullified the insurance policies' exclusionary provisions respecting suicide pleaded as an affirmative defense by the insurance company. General American sought an instructed verdict on the suicide issue (Question No. 1) and objected to its submission to the jury. The official death

---

* The panel before whom this cause was submitted consisted of T.C. Chadick, retired chief justice Court of Appeals, Sixth District of Texas at Texarkana. Honorable Gerald T. Bissett, retired justice, Court of Appeals, Thirteenth District of Texas at Corpus Christi. Honorable Jackson B.

Smith, Jr., retired justice, Court of Appeals, First District of Texas at Houston, sitting by assignment of the Chief Justice of the Texas Supreme Court pursuant to Tex.Gov't Code Ann. § 74.003(b) (Vernon 1988).

certificate showed the cause of death as undetermined. The issue was hotly contested and voluminous evidence produced. General American's Cross–Points 10 and 11 present issues of no evidence and insufficient evidence to support the jury's answer to the suicide issue.

When testing *legal* insufficiency points, the reviewing court must consider only the evidence and reasonable inferences therefrom supporting the findings, disregarding all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). If there is some probative evidence supporting the jury's finding, the legal insufficiency point must be overruled. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). On the other hand, *factual* insufficiency points require consideration of all pertinent evidence to determine whether the proof amounts to more than a scintilla of evidence; if so, the evidence is factually sufficient. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d at 661.

Mr. Blake and his wife, Doris, arrived at the Cotton Eyed Joe Club at about 11:00 p.m. on the evening before Mr. Blake's death from a gunshot wound inflicted a few hours later.[1] The club manager testified he saw Mrs. Blake slap her husband as they entered the club. The manager interceded, Mrs. Blake went outside and Mr. Blake went to the bar, saying, "I thought it was settled in the car."

In a short time, the manager saw Mrs. Blake reentering, and left his office and walked with her to the bar. When she reached the bar, her husband's back was to her; she shoved him, causing his drink to spill. Again, the manager interceded. Mrs. Blake leaned over on her husband's shoulder. The manager thought Mrs. Blake was whispering to her husband and heard Mr. Blake say, "Woman, did you bite me?", and saw him firmly grasp her right shoulder, but Mr. Blake did not otherwise make physical contact with his wife. The couple soon left the club, but the manager noticed them sitting in

their automobile outside when he was closing the club at midnight. The gunshot episode occurred approximately two hours after midnight at the Blake residence.

The gun said to be involved was submitted by police to laboratory examination. The laboratory reported inability to find fingerprints on it. Hand swabs from the person of Mr. Blake were also subjected to laboratory examination. The laboratory was unable to detect gunshot residue (antimony, barium, and lead) on the hand swabs submitted. The report stated:

> The absence of gunshot residues on hand swabs is consistent with any of the following conditions.
>
> . . . .
>
> (C) Gunshot residues were deposited, but were removed or reduced due to moisture or wiping of the hands.
>
> (D) The weapon used does not deposit gunshot residues in sufficient quantity for detection on the hands of the persons firing the weapon.

Other laboratory tests shows that the gun tested emitted gunshot residue. Mortuary personnel reported that Mr. Blake's hands were placed in plastic bags and not cleaned before the hand swabbing test procedure occurred. An autopsy report of an external examination of Mr. Blake's body, aside from a bullet wound to the head, located superficial abrasions of the right chest, suggestive of bite marks.

Mrs. Doris Blake was not tested by police to determine whether her hands showed gunshot residue. She refused to undergo a polygraph examination. Expert opinions were given that the fatal wound was consistent with a struggle over a gun or a scuffle in which Mr. Blake was holding a gun. A licensed investigator and forty-year veteran of the Nacogdoches police department testified as to his investigation, and stated his opinion was that the police homicide investigator's investigation was slanted in favor of Mrs. Doris Blake.

---

1. Summarizing and condensing all pertinent evidence without distorting it is a task that requires great care and frequently eludes the best intentioned writer.

When the no legal evidence standard is applied, the foregoing is sufficient to show there is evidence from which reasonable inferences may be drawn to support the jury's conclusion and finding that Mr. Blake did not commit suicide. General American's no evidence contention is not well taken. Its Cross–Point No. 10 is overruled.

Consideration of General American's *factually insufficient* evidence point requires consideration of all evidence bearing upon the answer to Question No. 1. Scattered through the ten-volume, over 2,000–page, statement of facts is evidence pertinent to the issue. Relevant evidence, other than that already recited, tends to contradict, explain away, or cast doubt upon the verity of evidence supporting the jury's answer. This is illustrated by four disclaimers accompanying the Department of Public Safety's laboratory report on gunshot residue. The two that appear pertinent were recited earlier. There is eyewitness evidence from decedent's widow, Mrs. Doris Blake, that she observed Mr. Blake shoot himself. Also, there is evidence that Mr. Blake was faced with and undergoing financial difficulties in the operation of his business, as well as domestic, alcoholic and health problems. From all the evidentiary record, inferences may be drawn that Mr. Blake had mentally stressful problems with a potential of inducing self destruction and, if believed, tended to support a suicide finding.

The probative effect of the contradictory and explanatory nature of the evidence depends upon its credibility. The right to determine credibility lies exclusively with the jury. Applying the standards guiding a factual insufficient evidence review, where all evidence is considered, it is apparent that the evidence pointed out as supporting the answer to Question No. 1 is factually sufficient. General American's Cross–Point No. 11 is overruled.

Under Cross–Points No. 12, 13, 14 and 15, General American contends the jury's answers to Questions No. 2 and 3 are established as a matter of law, as well as being contrary to the great weight and preponderance of the evidence. The Blake Group's reply to these cross-points is that sufficient evidence supports the jury's answer to Questions 2 and 3 and, under the heading "Argument and Authorities" they support this stance with a brief assertion that:

> The Appellee's arguments set forth in its brief are moot. Because the Jury answered Question 4, "No," that CLAYTOR BLAKE did not misrepresent his medical history, the Jury's answers to Questions 2 and 3 are of no effect and moot.

The group otherwise abandons concern for the points.

■ The trial court apparently submitted Questions 2 and 3 on the theory that establishment of the facts inquired about was material and related to General American's defense that Mr. Blake made misrepresentations in his application for the insurance policies. The Blake Group's reply brief does not challenge or deny the accuracy of the statement of facts relative to Cross–Points 12 through 15 in General American's original brief. Acceptance of General American's statement of the facts by the Group warrants acceptance by this Court. Tex.R.App.P. 75(f). Cross–Points 12 through 15 are sustained. However, reversible error is not shown as the findings are immaterial. The life insurer's failure to deliver a copy of the application to the policyholder prior to the insured's death does not presently preclude the insurer from relying upon the insured's misrepresentation to rescind the policy under the reasoning of *Wise v. Mutual Life Ins. Co. of New York*, 894 F.2d 140 (5th Cir.1990).

Under Cross–Point 16, General American argues that the record establishes as a matter of law that Mr. Blake misrepresented his medical history in order to obtain the insurance contracts in suit. The issue was submitted to the jury by Question No. 4, with the burden of proof resting upon General American.[2]

The record contains Mr. Blake's application for insurance dated April 16, 1985,

---

2. The discussion in the original opinion drifted away from this posture of the case and is the principal reason for rewriting the opinion.

slightly less than seven months before his death on November 7, 1985. Mr. Blake answered "No" to the following questions in his application:

> (6) Other than above, have you within the past five years:
>
> . . . .
>
>> (b) Had a checkup, consultation, illness, injury or surgery?
>>
>> (c) Been a patient in a hospital, clinic, sanitorium or other medical facility?
>>
>> (d) Had electrocardiogram, x-ray, other diagnostic tests?
>>
>> (e) Been advised to have any diagnostic tests, hospitalization or surgery which was not completed?
>
> . . . .
>
> (12) Have you ever been treated for alcoholism or any drug habit?

The jury answered "No" to Question No. 4 in the charge, which asked,

> Did Claytor Blake, III misrepresent his medical history in order to obtain insurance?
>
> In order to find that Claytor Blake, III misrepresented his medical history, you must find each of the following:
>
>> (1) Claytor Blake, III made a representation;
>>
>> (2) that the representation was false;
>>
>> (3) General American relied upon the representation;
>>
>> (4) that Claytor Blake, III intended to deceive General American in making the representation; and
>>
>> (5) that the representation was material.

The submission is not questioned and appears to be authorized by *Mayes v. Massachusetts Mutual Life Ins. Co.*, 608 S.W.2d 612 (Tex.1980).

The record will be examined as to each of the five elements of Question No. 4 to determine if each particular element is established as a matter of law by the evidence. If not, General American's Cross–Point 16 must be overruled.

Element (1), representation. The Blake Group's general position is that an application was made and a policy issued, but it does not concede anything further. Mr. Blake's purported application is in the record. It was admitted into evidence by the trial judge, and its admission is not now questioned. The application contains Mr. Blake's representations to the insurance company and is evidence thereof. The proof establishes the representations in the application as a matter of law.

Element (2), falsity of the representation. The record contains evidence of Mr. Blake's consultation with doctors and details about his ill health, diagnosis of and medical treatment for ill health, as well as having been a patient in a medical facility. Mr. Blake informed General American that his family physician was Dr. Klein and that Dr. Klein had treated him most recently for influenza and in the past for an ulcer. Mr. Blake also disclosed that he smoked two packs of cigarettes a day and gave General American authorization to obtain any of his medical records it might desire. Intent to deceive aside, it is undisputed that the representations as to hospitalization are false. Element (2) is proven as a matter of law.

Element (3), reliance upon the representation. There is testimony that the insurer relied upon the representation made in Mr. Blake's application for insurance and the policies were issued. There is an absence of evidence that the insurer knew when it issued the policies that one or more of the material representations in the application was false. Element (3) is established as a matter of law.

Element (5), materiality of the representations, will be considered out of order. The questions in the insurance application listed above to which Mr. Blake answered in the negative are related to Mr. Blake's health and life expectancy. Answers formed a foundation for estimates of longevity. A false answer to one or more of these questions deprived the insurer of information upon which to calculate its risk and the desirability of entering into an insurance contract. Unquestionably, Mr. Blake's representations were material to the risk his answers would tend to induce the insurer to underwrite. Element (5) was established as a matter of law.

Element (4), intent to deceive, was bypassed to allow a more extended discussion, as it is the center of the controversy. Mr. Blake signed a request for admission to Humana Hospital Brentwood in Shreveport, Louisiana, on January 18, 1984, approximately two months before he made application for the insurance in suit. The application contained an agreement to give seventy-two hours' notice of a request for discharge. A psychologist familiar with psychiatric hospitals said the structures are built with a lock system designed to prevent a patient from making an unauthorized departure. Mr. Blake was intoxicated when he arrived and was admitted to the hospital.

His then wife, Sandra Blake, from whom he was later divorced in May 1984, provided the admittance personnel with the bulk of Mr. Blake's social history. The history record recites, "According to the patient's wife, the patient is being admitted to the hospital for treatment of alcoholism.... She 'made the decision to admit the patient to Brentwood upon the recommendation of Dr. Klein." An attending nurse's report says, "Wife gave information as she was more reliable than [patient]." A nurse's report dated January 19, 1984, said, "He insists he is ready to leave the hospital, 'I never been shut up this long in my life.'" Mr. Blake Called his wife to pick him up, as he was not going to stay. A Dr. Riley participated in recording Mr. Blake's history and physical examination. This extract is from the record:

Q. All right. Is there any place else in these—this report by Dr. Riley that refers to his alcohol intake?

A. In the history, which would be—which would be the history given by the patient to Dr. Riley, he is said to have a long history of alcoholism and prior to his admission he was drinking approximately one fifth of alcohol per day and states that he desires to be free of his alcohol because of the strong likelihood of losing his construction business. He has had episodes of withdrawal and delirium tremens; however, he has not had any seizure disorder or any pancreatic or liver problem as the result of alcoholism.

Sandra Blake testified that her husband received no treatment at the hospital and quoted his statement that he did not. She said he disagreed with her that he drank too much and never admitted he was an alcoholic. When Mr. Blake was discharged from the hospital on January 23, 1984, he was advised to take outpatient treatments for alcoholism, but he did not commit himself to do so.

From the indicated evidence and other consistent therewith, reasonable inferences may be drawn that in his mind Mr. Blake did not consider the hospital interlude as hospitalization in any usual sense or his stay as treatment or the attention received as any form of a checkup or other test or diagnostic procedure. It may be inferred that when he made the insurance application, he wholly discounted the hospital interlude as treatment, believing himself to be an involuntary prisoner at the hospital, and that any show of cooperation with attendants was an effort to effect release. Inferences also might be drawn that his mind blacked out on the early facts of the hospital confinement and had no memory of the transaction in its entirety.

This evidence raises an issue of fact regarding intent to deceive General American. No memory of the occurrence or a genuine belief that the interlude was not hospitalization would negate an intent to deceive. The jury answered the intent element of Question No. 4 favorable to the Blake Group. Cross-Point 16 must be overruled.

■■■ However, Cross–Point 17 puts in issue the great weight and preponderance of the evidence pertaining to the elements of Question No. 4. Weight of evidence is the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. Preponderance of evidence, as a standard of proof in civil cases, is evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not. BLACK'S LAW DICTIONARY 1182 (6th ed. 1990).

A review to determine whether a finding is contrary to the overwhelming weight and preponderance of the evidence requires consideration of all the evidence in the record pertinent to the finding to determine whether the finding is clearly wrong and manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660.

In 1980, Claytor Blake, III and his first wife, Sandra, owned and operated Blake Field Services, a construction business, and M & M Yamaha, a motorcycle dealership. The combined sales of both businesses in 1980 were approximately $540,000.00. In 1985, the combined sales reached $1,200,-000.00. The motorcycle agency accounted for a very small part of the totals. Mr. Blake personally operated the construction business, and Mrs. Blake was in charge of the motorcycle agency.

The operator of the type business Mr. Blake was principally engaged in is commonly called a "contractor." Operation includes bidding upon construction jobs and satisfactory performance in compliance with the obligations of a contract and specifications governing a job. Mr. Blake was familiar with the details of contracting and the importance of compliance. His background is that of a seasoned operator with several years of success and expanding business.

In 1984 and 1985, an economic slow-down in the company's business area was hampering cashflow. Domestic difficulties resulted in divorce from Sandra in May 1984. Mr. Blake took on an extra financial burden in settling the marital estate. Mr. Blake's former wife testified that in the settlement of their marital estate Mr. Blake agreed to furnish life insurance to cover indebtedness to her, as well as to cover bank indebtedness. She knew he was "getting" the insurance policies in suit, but did not know about them being assigned to the banks.

Claytor Blake, Inc. was the owner and beneficiary of the two life insurance policies. Mr. Blake assigned one policy to Fredonia State Bank and the other to Commercial National Bank to secure outstanding loans contracted with each of them.

The president of Fredonia State Bank at the time Mr. Blake assigned the bank one of the policies in suit testified that he was probably the bank's representative that suggested Blake assigned the policy, saying it was "not the first time this has happened." The banker testified it was bank policy to require life insurance when "the individual that owes the money is a kind of one-man operation, that is, a key man situation." He considered Mr. Blake as the "sole management, the ramrod of the whole thing...." He first testified Mr. Blake's indebtedness to the bank was $300,000.00 principal and mentioned an overdraft, but not its amount at the time of Mr. Blake's death. In answer to further questions, he reduced his estimate of the amount of indebtedness to the bank at the death of Mr. Blake to "probably between two fifty and two seventy."

A director of Commercial National Bank testified the bank did not request assignment of an insurance policy, that Mr. Blake voluntarily made the assignment to the bank; also that Mr. Blake made his payments on time and was not considered a bad credit risk. The bank made loans "just a short period of time before his death." This witness estimated Mr. Blake's indebtedness to the bank at approximately $230,000.00 at the time of his death. By sale of mortgaged assets the indebtedness was reduced by $70,000.00.

The evidentiary inferences that Mr. Blake did not know or remember any or all of the Humana Hospital Brentwood interlude or that he believed his stay there did not amount to hospitalization is unaided by expert opinion. The jury's conclusion that Mr. Blake did not intend to deceive by his answer to the questions in the application totally discounts Dr. Klein's medical record evidencing treatment for high blood pressure, etc. that he had rendered Mr. Blake in five years preceding Mr. Blake's death. Nothing in the record casts doubt upon the verity of Dr. Klein's records.

The weakness or absence of cogency and probative value in the evidence and inferences therefrom tending to support the jury's implied finding of no intent to deceive is illustrated by the construction the jury necessarily gave Mr. Blake's written application

for the insurance policies. It is undisputed that Mr. Blake represented in the documents that he had not been hospitalized in the preceding five years. The jury's answer to Question No. 4 clearly disregards the undisputed fact that he was actually hospitalized for several days. Evidence was produced that Mr. Blake had been drinking to excess before the hospital interlude; also, that he had on occasion following a drinking bout retained no memory of occurrences during the period of inebriation. No evidence was produced that blackouts occurred with every drinking episode. He was intoxicated when admitted to the hospital. Proof that psychiatric hospitals in general have a restraint system is not proof that the hospital where Mr. Blake was confined held him against his will. The evidence is undisputed that he was permitted to leave when he chose to do so.

A condensed version of evidence and inferences therefrom supporting and countering the jury's negative answer to Question No. 4 has been recounted. An analysis of evidence pertaining to Element 4 of Question No. 4 in the jury charge dealing with Mr. Blake's intent to deceive the insurer will be examined to determine whether the jury's answer to the question is so contrary to the overwhelming weight and preponderance of the evidence as to be unjust.

It is undisputed that Mr. Blake represented to the insurer in his application for insurance that he had not been hospitalized in the five years previous to the representation. Also undisputed is evidence that he was actually hospitalized.

As proof that Mr. Blake did not intend to deceive the insurer, the Blake Group points to evidence that Mr. Blake informed the insurer that Dr. Klein had most recently treated him for influenza and in the past for ulcer. He also disclosed that he smoked two packs of cigarettes daily and authorized the insurer to obtain any of his medical records it might desire. Argument is made that this disclosure negatives an intent to deceive the insurer by false representation in the application because it shows he did not misrepresent all details of the state of his health and

invited the insurer to make any health investigation it desired. However, it also may be inferred that apparent candor in the disclosure and a bold authorization might allay doubt about health and forestall and investigation. On further analysis, given the clear written representation, intent not to deceive may be read into the application only by an Alice in Wonderland[3] construction that gives plain language only the meaning that the user chooses it to have.

Among the factual circumstances countering a negative answer to Element 4 of Question No. 4 is evidence that Mr. Blake was a seasoned, middle-aged businessman who had successfully operated a substantial business organization for many years. An economic slow-down seriously curtailed the business' cashflow, and he expressed fear of losing his construction business. An audit of the business operations covering the year before his death disclosed that he was making no headway in retiring his indebtedness. One of his bank creditors required him to carry life insurance. In connection with a divorce settlement, he promised to carry life insurance to secure payment of settlement obligations. There is evidence that one of the policies in suit named his former wife as beneficiary, but was changed before Mr. Blake's death.

Prior to securing the policies in suit, Mr. Blake carried a $300,000.00 life policy. He applied to an undisclosed insurer for a policy which required a physical examination. The application lapsed after a salesman for General American solicited him and showed him a savings in cost by purchasing the coverage provided by the policies in suit.

There is self-serving evidence that one bank creditor did not require Mr. Blake to support his bank loan by life insurance and considered him a good credit risk. Evidence in the record shows he was overdrafted at one bank and that payroll problems had been encountered before his demise.

In short, the record shows evidence of an experienced businessman engaged in the serious business of acquiring a substantial amount of needed life insurance coverage

**3.** "When I use a word," Humpty Dumpty said, "it means just what I choose it to mean—neither more nor less." Lewis Carroll, Through The Looking-Glass.

signing an application that contained material false representations. The evidence shows a motive and incentive for so doing in that the insurance policies were needed and would serve as a quick and economical way to shore up Mr. Blake's credit worthiness with bankers and other creditors and help maintain a viable business operation.

A comparison of the weight and preponderance of evidence that supports an affirmative answer to Element 4 of Question 4 of the charge so overwhelms the weight and preponderance of the evidence supporting a negative answer that the jury's negative answer is manifestly unjust. General American's Cross–Point 17 is sustained.

Sustaining General American's Cross–Point 17 necessitates reversal and remand for new trial, thereby rendering decision on General American's remaining points superfluous.

## THE BLAKE GROUP APPEAL

The Blake Group's points of error have been examined, but disposition of the points is immaterial, as reversal and remand, regardless of their merit, must be made in accordance with the disposition of General American's Cross–Point 17.

## APPELLATE JURISDICTION

 A document labeled "Final Judgment" was signed by the trial judge and entered in the trial court on May 14, 1990. A second document labeled "Order" signed by the trial judge and filed July 27, 1990, "ordered that the judgment in this case should be reformed by deleting $276,142.45 attorney's fees and reducing the total by $276,-142.45 to reflect the ruling of the court on defendant's motion for judgment notwithstanding the verdict signed this date." A third document labeled "Reformed Final Judgment" was signed August 27, 1990, and entered August 28, 1990. In the body of the August judgment, neither the May judgment nor the July order is alluded to directly. Counsel for the parties was invited by the original opinion to consider whether the one final judgment provision of TEX.R.CIV.P. 301 is involved.

The Blake Group's motion for rehearing has briefed contentions that this Court has committed fundamental error in assuming jurisdiction and reversing judgment of the trial court because of the requirements of TEX.R.APP.P. 40 and 41, as the May judgment was final and the August judgment was a nullity.

 The finality of a judgment is determined in the light of the entire record. *Lubell v. Sutton,* 164 S.W.2d 41, 44 (Tex.Civ. App.—Texarkana 1942, writ ref'd); *Ware v. Jones,* 250 S.W. 663 (Tex.Comm'n App.1923, judgm't adopted). The trial court has plenary power to vacate, modify, correct, or reform its judgment within thirty days after the judgment is signed or thirty days after all timely motions for new trial are overruled. TEX.R.CIV.P. 329b(d), (e). Any change, whether or not material or substantial, made in a judgment while the trial court retains plenary power, operates to delay the commencement of the appellate timetable until the date the modified, corrected, or reformed judgment is signed. *Landmark American Ins. Co. v. Pulse Ambulance Service, Inc.,* 813 S.W.2d 497, 498 (Tex.1991); *Check v. Mitchell,* 758 S.W.2d 755 (Tex.1988); TEX. R.CIV.P. 329b. The August judgment is final. *See Beacon Homes, Inc. v. Aguilar,* 552 S.W.2d 506 (Tex.Civ.App.—El Paso 1977, no writ), *citing Mullins v. Thomas,* 136 Tex. 215, 150 S.W.2d 83 (1941).

The final judgment herein was filed August 27, 1990, and appeal costs deposit was made September 4, well within the time limits fixed by TEX.R.APP.P. 40 and 41 for perfecting an appeal. This Court has jurisdiction of the appeal, and contentions to the contrary are overruled.

## DISPOSITION

The cross-points attacking the jury's answers to jury questions forming the basis of judgment entered by the trial court have been considered, and General American's Cross–Point 17 has been sustained. The judgment of the trial court will be reversed and the case remanded for new trial;

Disposition of the numerous points of error and cross-points of error not addressed will

be reserved, as they will not necessarily arise in a new trial;

The Blake Group's motion for rehearing is overruled;

The original opinion herein is withdrawn and this opinion substituted therefor;

All of which is hereby directed and ordered.